UNR INDUSTRIES, INC., et
al., Plaintiffs,

v.

CONTINENTAL INSURANCE
COMPANY, et al.,
' Defendants.

Nos. 85 C 3532, 83 A 2523.

United States District Court,
N.D. Illinois, E.D.

Feb. 25, 1988.

Malcolm M. Gaynor, Richard Bendix, Jr., Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., Ronald M. Oster, Madeline Hickey, Paul, Hastings, Janofsky & Walker, Santa Monica, Cal., Sandy Klekowski, UNR Industries, Inc., Chicago, Ill., for UNR.

Daniel J. Pope, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for American Re–Insurance Co.

D. Patterson Gloor, Michael J. Gallagher, Cassiday, Schade & Gloor, Gerald G. Saltarelli, Ronald Butler, Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, Ill., for Bituminous Cas. Co.

Lloyd E. Williams, Anthony P. Katauskas, Jacobs, Williams and Montgomery, Ltd., Chicago, Ill., for Commercial Union Assur. Companies.

Perry L. Fuller, Robert E. Nord, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Continental Cas. Co.

Thomas L. Aries, Merrill C. Hoyt, Aries, Hoyt & Taden, Stanley B. Block, Donald W. Jenkins, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Continental Ins. Co. and Underwriters Adjusting Co.

Thomas C. Walker, James E. O'Halloran, Jr., O'Halloran, Lively & Walker, Northbrook, Ill., for Corroon & Black of Illinois, Inc.

Michael J. Dolesh, David M. Spector, Isham, Lincoln & Beale, Chicago, Ill., for Employers Reinsurance Co.

Terrence E. Kiwala, Rooks, Pitts, Fullager & Poust, Chicago, Ill., for First State Ins. Co.

Donald M. Haskell, Michael Sehr, William Ryan, Haskell & Perrin, Chicago, Ill., for Home Ins. Co.

Gary M. Elden, Philip C. Stahl, Donald A. Vogelsang, Reuben & Proctor, Chicago,

Ill., for Nat. Sur. Corp. and Fireman's Fund Ins. Co.

Philip J. McGuire, Dowd & Dowd, Chicago, Ill., for Northbrook Ins. Co.

J. William Cuncannan, Sarah M. Stegemoeller, DeFrees & Fiske, Chicago, Ill., for Official Creditors Committee.

Peter C. John, Douglas J. Lipke, Matthew J. Gehringer, Phelan, Pope & John, Ltd., Chicago, Ill., for Zurich Ins. Co.

Malcolm M. Gaynor, Richard M. Bendix, Jr., Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., for debtor in possession.

Kevin M. Forde, Kevin M. Forde, Ltd., Chicago, Ill., for unknown putative asbestos-related claimants.

Stanley A. Walton III, Winston & Strawn, Chicago, Ill., for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

### I.

### *Nature of the Case*

UNR Industries, Inc., its predecessors and owned affiliated companies (hereinafter "UNR") manufactured asbestos products beginning in the 1920's. Most production ceased by 1963 and all production stopped by 1970. In December 1966, the first products liability claim involving injury from exposure to asbestos products was filed. *Tomplait v. Combustion Engineering, Inc., et al.* UNR was named a party to this action in August 1968. Claims against it had accumulated to approximately 17,000 when UNR filed for bankruptcy reorganization on July 19, 1982.

Until this proceeding was initiated as an adversary matter in the bankruptcy court, UNR contended that it first purchased liability insurance which provided primary coverage for products hazards from Zurich Insurance Company ("Zurich") on June 26, 1958. Zurich provided primary products coverage to UNR until November 1, 1964.

After that date and for six years until November 1, 1970, primary products liability coverage was provided by Bituminous Casualty Corporation ("Bituminous"). From November 1, 1970 until May 7, 1980, Continental Insurance Company ("Continental") provided products coverage to UNR. UNR has not had primary products coverage for asbestos products since May 7, 1980. UNR also purchased umbrella and excess products liability coverage from various carriers as hereinafter set forth.

Early liability suits filed against UNR were referred by its attorneys and brokers to Zurich and Bituminous. Questions of insurance coverage were immediately raised. The now common disputes in asbestos products insurance coverage cases are: (1) What events trigger insurance coverage? (2) What is the insured's individual liability for damages and defense costs for any period not covered by insurance? (3) What is a carrier's responsibility for defense costs after indemnity limits are exhausted? Allocation questions in cases filed against UNR prior to 1976 were resolved on an individual basis at the time of disposition. Initially, Continental was not involved because Continental did not provide primary coverage until November 1, 1970. By this time UNR was out of the asbestos manufacturing business although its products continued to be in the public domain. In 1976 UNR and Continental entered into a letter agreement dated March 26, 1976 (as part of its 1976 policy) relating to Continental's 1970–75 policies that provides a formula for the allocation of payments of claims and expenses by Zurich, Bituminous and Continental for claims made during and prior to the year 1976. UNR thereafter entered into apportionment agreements with its primary carriers as part of Continental's 1977, 1978 and 1979 policies. UNR did not purchase primary coverage from Continental after May 7, 1980. It did, however, continue to have claim sharing agreements with Zurich, Bituminous and Continental. In October of 1981, UNR terminated its apportionment agreements with Zurich, Bituminous and Continental effective December 31, 1981.[1]

---

1. Throughout the period 1976–1981 and during these proceedings the parties have referred to these agreements as the Houston agreement or

During 1982, UNR's primary, umbrella and excess insurance carriers filed declaratory judgment suits in the Circuit Court of Cook County. These suits were stayed by operation of law when UNR filed bankruptcy proceedings. The carriers then filed adversary claims in the bankruptcy court and UNR filed adversary claims against its insurance carriers. UNR and the carriers moved for withdrawal of the adversary claims to this court. It was represented that UNR's primary, umbrella and excess insurance carriers should be allowed to participate in the same proceeding rather than in a series of cases in the state or bankruptcy courts. It was further asserted that a jury was demanded by UNR to resolve factual disputes and, therefore, the case could not proceed to trial before a bankruptcy court.

The proceedings were withdrawn to this court. Thereafter, in amended pleadings, UNR was styled the plaintiff and the insurance companies were designated defendants. UNR was also given leave to amend its pleadings to name as additional parties defendant National Surety Corporation and Fireman's Fund Insurance Company[2] ("National Surety"), and Corroon & Black of Illinois, Inc. ("C & B"), its former insurance broker. UNR alleged that it first discovered in 1983 that it had products liability coverage prior to June 26, 1958 from National Surety and Zurich, but that its insurance contracts were lost. UNR filed negligence, misrepresentation and fiduciary claims against its former broker C & B. It also alleged breach of contract, rescission and tort claims against its primary carriers, as well as antitrust and RICO violations. The primary and excess carriers counterclaimed for declaratory relief seeking a declaration of their rights and obligations under Illinois law.

By January of 1984 the litigation was extremely complex. Numerous pleading and discovery issues were before the court.

Some of these matters are more fully described in opinions dated November 30, 1984, 607 F.Supp. 855 (N.D.Ill.1984), April 9, 1985, 623 F.Supp. 1319 (N.D.Ill.1985) and October 7, 1985.

In keeping with the practice adopted by other courts hearing litigation of this type[3] and in order to expedite the resolution of insurance coverage questions that could facilitate disposition or settlement, it was decided to try the insurance coverage claims and issues separately as is permitted by Rule 42(b) of the Federal Rules of Civil Procedure. After a pretrial conference at which the parties were permitted to suggest a plan for expedited disposition, it was specified that expedited discovery would proceed on certain insurance claims and issues. A pretrial order dated January 5, 1984 provided for expedited discovery on the following matters:

a. Existence, terms and compliance with notice and other provisions of insurance policies allegedly issued to UNR, the existence of which is disputed.

b. Exhaustion of limits and duty to defend if limits are exhausted.

c. Drafting, negotiation, execution, interpretation and amendment of the Houston agreement.

By November 27, 1985, the period fixed for discovery on the expedited issues had expired and the parties were engaging in general discovery on other issues. The period for general discovery had not yet closed. The parties had exchanged thousands of documents and taken more than 150 depositions. It was apparent that unless halted this discovery would go on at great additional cost to the estate without resolution of the initial insurance coverage disputes. Accordingly, on November 27, 1985, further discovery was stayed and the parties were directed to submit a final pretrial order for trial of the expedited issues.

---

agreements. Apparently the first agreement was based upon understandings discussed or reached in Houston, Texas where suits were pending.

**2.** Fireman's Fund Insurance Company acquired National Surety.

**3.** See, e.g., *In re Asbestos Ins. Coverage Cases, Coordination Proceeding*, No. 1072, Superior Court of California. The first phase of this case resolved the trigger of coverage issues after a bench trial which lasted more than one year. A 107 page opinion was issued in the case on May 29, 1987. Also, see T. Willging, *Trends in Asbestos Litigation* (Federal Judicial Center 1987).

The Phase I issues were as described above and include "the validity and meaning of the so-called Houston agreement."

On December 16, 1985, an order was entered directing that the parties state their positions in pretrial briefs as to whether or not they regarded the terms of the various insurance contracts, including both those of the primary carriers and excess carriers, as ambiguous. The parties were further instructed to argue the contract interpretation issues with a view towards declaratory relief on those contract interpretation questions that are a question of law for the court.

Prior to trial, litigation was also pending in the Illinois courts with respect to what events trigger products liability insurance coverage in asbestos cases and with respect to the obligation of insurance carriers to defend after policy limits are exhausted. Those issues were decided by the Illinois Supreme Court on September 15, 1987. *Zurich Insurance Company v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987).[4] This court can now grant declaratory relief based on the Illinois Supreme Court's decision.

## II.

### The Phase I Trial

On March 12, 1987, a nine week jury trial began which resulted in the submission to the jury of 14 special verdicts with subparts.[5] UNR has filed motions for judgment notwithstanding the verdict and for a new trial.

A. Initial Asbestos Claims Against UNR

Prior to trial, the parties submitted a draft pretrial order which contains, in part, the following uncontested facts.

\* \* \* \* \* \*

29. On December 23, 1966, Claude J. Tomplait filed the case of *Tomplait v. Combustion Engineering, Inc., et al.* (the *"Tomplait"* case) against various asbestos manufacturers, including Pittsburgh Corning Corporation, seeking damages. Tomplait's original complaint did not name UNR as a defendant.

30. In the *Tomplait* case, Pittsburgh Corning Corporation, one of the asbestos manufacturer defendants, filed a third party complaint against UNR on August 13, 1968. In January, 1969, Tomplait amended his own complaint to add UNR as an additional defendant manufacturer.

31. Bituminous's position with respect to the *Tomplait* case was to deny coverage on the basis that all exposure to asbestos preceded the effective date of Bituminous policies issued to UNR.

32. Zurich's response to the *Tomplait* case was to send a reservation of rights letter to UNR and to retain Gerald Coley of the firm of Vinson, Elkins, Weems & Searls to defend UNR in *Tomplait*.

33. By June 4, 1969, UNR had been sued in Beaumont, Texas by Samuel Potter in *Potter v. Fibreboard, et al.* (the *"Potter"* case). Potter claimed he had been exposed to asbestos from 1940 to 1967.

34. Zurich's response to the *Potter* case was to forward a reservation of rights letter to UNR and to retain Coley to defend UNR.

35. Bituminous's position with respect to *Potter* was that coverage existed for that portion of the alleged period of exposure during which Bituminous covered UNR. Bituminous joined in the retention of Coley to represent UNR.

36. By August 1, 1969, UNR had been sued in Texas by David R. Parker in *Par-*

---

**4.** UNR filed amicus briefs in this proceeding.

**5.** Based on federal law, it was concluded that UNR was entitled to a jury trial because the ultimate relief it seeks is money damages against the defendants even though this phase of the case is limited to a consideration of insurance coverage questions. Since the findings could affect other claims, it was concluded, over defendants' objections, that UNR had a right to jury findings. *Simler v. Conner*, 372 U.S. 221,

222–23, 83 S.Ct. 609, 610–11, 9 L.Ed.2d 691 (1963); *Chapman v. Kleindienst*, 507 F.2d 1246, 1253 (7th Cir.1974). If it should be concluded based on Illinois law (*Zurich v. Raymark*, 118 Ill.2d 23, 112 Ill.Dec. 684, 699–700, 514 N.E.2d 150, 165–66 (1987)) that UNR was not entitled to a jury trial because the issues are equitable, this court adopts the jury's well-supported findings as the findings of the court on the issues resolved by the jury.

*ker v. Combustion Engineering, Inc.* (the *"Parker"* case). Parker claimed exposure to asbestos products from 1952 through 1969.

37. By October 29, 1969, UNR had been sued in Beaumont, Texas by Clarence Borel in *Borel v. Fibreboard, et al.* (the *"Borel"* case). Borel claimed exposure to asbestos from 1936 through 1969.

38. Zurich's response to the *Borel* case was to retain Coley to represent UNR and to forward a reservation of rights letter similar to the one sent in *Potter.*

39. Bituminous's position with respect to *Borel* was that coverage existed for that portion of the alleged period of exposure during which Bituminous insured UNR. Bituminous joined in the retaining of Coley to represent UNR.

40. The *Tomplait, Parker, Potter* and *Borel* cases were settled among UNR, Zurich and Bituminous on a case-by-case basis.

\* \* \* \* \* \*

### B. The Jury Issues and Verdicts

At the Phase I trial the parties contended in substance as follows:

(1) UNR asserted that in 1983 it discovered that National Surety had issued two lost comprehensive general liability policies (one for the period April 28, 1945 to January 1, 1948 and one for the period January 1, 1948 to January 1, 1949) which each provided for bodily injury insurance coverage of $100,000 per person and $300,000 per accident for exposure to asbestos products without any aggregate products liability limits for bodily injury. National Surety denied that any policy issued by it contained products liability coverage and denied that UNR gave it timely notice of accidents and claims. The jury found (Verdicts 1 and 2) that UNR did not prove the existence of such policies. The jury also decided that UNR did not give timely notice of accidents and claims to National Surety (Verdict 3).

(2) Documents offered in evidence with respect to Zurich insurance coverage prior to June 26, 1958 contain limitations and exclusions of products liability. The early documents in evidence are from the records of UNR's brokers who provided copies of the broker's records of the insurance and exclusions to Zurich when UNR asserted coverage of the *Potter* suit filed in 1969. Neither UNR nor Zurich then had copies of the actual contracts issued to UNR prior to 1961. The exclusion endorsements each refer to an issued Zurich policy by specific number and contain the statement that "[i]t is agreed that the policy does not apply to the products hazard as defined in the policy." [6] (ZE 3, 4, 5, covering the period of January 1, 1949–June 26, 1958). However, UNR questioned whether the endorsements in evidence could properly be considered as authentic copies of exclusion endorsements because it contended that they were inconsistent with certain underwriting practices of Zurich during 1949–1958. UNR offered proof of Zurich's practices as an aid to interpretation of the documents. Zurich contended that parol extrinsic evidence was inappropriate and denied that inconsistent practices existed.

Without deciding whether the documents were ambiguous (so to as to permit the consideration of parol evidence) and in order to resolve issues of authenticity and to obtain an understanding of the facts and practices, the parties' evidence was submitted to the jury. The jury found (Verdicts 4, 5, 6, and 7) that UNR did *not* prove that it was the practice of Zurich underwriters:

 (a) To have an insured accept, by signing an endorsement, any limitation of full products liability coverage;

 (b) To prepare "manuscript endorsements" when they issued comprehensive general liability policies providing partial but not full products liability coverage;

 (c) To omit any reference to aggregate limits for bodily injury from the declaration pages and to place such limits on the relevant endorsement when providing limited products liability coverage, during the period 1949–58;

 (d) To indicate all policy exclusionary endorsements on the "endorsements at-

---

**6.** An exception is stated for food products sold at certain premises.

tached" block of the declaration pages of any file or broker's copies of "dailys" by noting or identifying the exclusionary endorsement in the "endorsements attached" block of the "dailys" during the period 1949–1958.

The effect of the jury's verdict is to resolve any issue as to disputed extrinsic evidence and permit the court to interpret the insurance contract on the basis of the documents received in evidence. *City of Clinton v. Moffitt,* 812 F.2d 341, 344 (7th Cir.1987). As written, the exclusions apply, and no products coverage for asbestos claims was provided to UNR by Zurich prior to June 26, 1958.

(3) The primary carriers contended that UNR entered into apportionment agreements with them to resolve disputes and uncertainty over the meaning and application of their insurance contracts—the Houston agreement or agreements. While it admitted that certain cases had been settled by allocation of damages and costs among itself and its carriers during the period prior to December 31, 1981, UNR denied that the settlements were pursuant to the terms of any definitive or binding agreements with any of the primary carriers. The jury found (Verdict 8) that Zurich, Bituminous and Continental each proved that UNR did enter into such agreements, the terms of which are as follows:

UNR and its primary insurers (Continental, Zurich and Bituminous) agreed that where the claimant alleges in his complaint that he was exposed to Unarco asbestos products during any portion of the period during which Zurich provided coverage, Zurich would pay 25% of the costs and losses; where the claimant alleged that he was exposed to Unarco asbestos products during any portion of the period during which Bituminous provided coverage, Bituminous would pay 25% of the costs and losses. As to claims first asserted on or after January 1, 1980, Continental agreed to pay 4% of the costs and losses for such policy period during which exposure to Unarco asbestos products is claimed, subject to applicable deductibles for those years where Continental policies contain deductibles—1976, 1977, 1978 and 1979.

The balance of the costs and losses would be the responsibility of Unarco. Where no specific period of exposure to Unarco products is alleged, Zurich would pay 25%, Bituminous will pay 25%, Continental would pay 24% and Unarco would pay 26%.

For claims first asserted on or before December 31, 1975 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |
| Continental | 15% |
| Unarco | 35% |

For cases first asserted in 1976 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |
| Continental | 50% subject to a $15,000 per claim deductible |

For 1977 through 1979 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |
| Continental | 50% subject to a $30,000 per claim deductible |

During 1980 and 1981, the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |

The agreements were terminated by notice of UNR in October 1981 effective December 31, 1981.

(4) A separate dispute exists as to whether or not any agreements were intended to continue to apply to cases that were filed but not settled and closed as of December 31, 1981, the date of termination of the agreements. The primary carriers contended that the agreements are to apply. The jury found (Verdict 9) that each primary carrier proved that the agreements apply to cases filed but not settled as of December 31, 1981.

(5) UNR claimed that Zurich, Bituminous and Continental either acting individually, or jointly on behalf of each other or through UNR's broker, C & B, acting on their behalf (contrary to UNR's interests), induced UNR to enter into agreements with them, if any were made, by intentionally misrepresenting that C & B had "shopped the insurance market" prior to March 26, 1976 and that no new primary insurance coverage was available to UNR except that provided to UNR by Continen-

tal. UNR contended that this was done by Zurich, Bituminous and Continental in order to deprive it of greater insurance benefits than would otherwise be available to pay or settle asbestos claims and expenses under the terms of issued policies. The jury found (Verdict 10) that such misrepresentation was not proven by UNR.

(6) UNR contended that any apportionment agreements prior to 1983 were entered into as a result of a mutual mistake by UNR, Zurich, Bituminous or Continental that UNR did not have products liability insurance coverage prior to June 26, 1958. Inasmuch as the jury did not find that UNR had products hazard coverage prior to June 26, 1958, it did not answer the question (Verdict 11) with respect to whether such a mutual mistake occurred. For the same reason, the jury did not answer Verdicts 13(a) or 13(b) related to the statute of limitations.

(7) The jury found (Verdict 12) that Zurich, Bituminous and Continental proved that UNR waived or voluntarily and intentionally gave up the right to claim different treatment from Zurich, Bituminous or Continental for asbestos claims under its insurance policies.

(8) Finally, the jury found (Verdict 14) that each primary carrier proved that UNR is barred from pursuing its claims against it because each relied in good faith to its detriment on UNR's conduct in entering into the agreements.

### C. UNR's Motion for Judgment Notwithstanding the Verdict

#### (1) Verdicts 1, 2 and 3

■ UNR moved for judgment notwithstanding the jury's adverse verdict with respect to the existence of two lost National Surety policies CG–17304 and CG–53991 covering the period April 28, 1945 to January 1, 1949, respectively, which it contends provide for bodily injury insurance coverage of $100,000 per person and $300,000 per accident including products liability coverage without any aggregate products liability limits. UNR made a timely motion

for a directed verdict with respect to these claims (Tr. 8509). Ruling was reserved and UNR is entitled to have the matter considered.

The jury was instructed that in order to prevail (on Verdicts 1 and 2) UNR had to prove by clear and convincing evidence: (1) the policy period; (2) that the policy provided liability insurance for bodily injury, sickness or disease caused by accident; (3) that products hazard insurance coverage was provided; and (4) the limits of the coverage and aggregate products limits, if applicable.

UNR relied on its discovery in its offices in 1983 of copies of three certificates of insurance issued by National Surety on January 1, 1946, March 1, 1946 and March 15, 1946, (UNR 222, 222A, 222B) received in evidence over National Surety's objection pursuant to the ancient document rule.[7] (Rule 901(b)(8) Fed.R.Evid.) These certificates refer to policy CG–17304. The evidence shows that "CG" refers to comprehensive general and that CG policies were issued on standard forms during this period. (UNR 203, 313). However, as shown by the standard form general instructions and reference notes and the testimony, the forms could be completed either with or without providing products hazard coverage. Also, the standard forms provide for an aggregate limit of products hazard coverage during applicable policy years or periods and provide for the calculation of a products premium by applying a rate per $1,000 of sales when such coverage is provided.

The National Surety form certificates of insurance received in evidence provide that if products coverage is included in a policy an entry is to be made on the certificate form in a space above the following statement:

> "Use space immediately above for Products, Elevators, Automobile Non-ownership or other kinds of insurance not described."

---

7. The March 15, 1946 copy (UNR 222B) bears some indication on its face that it was superseded. Written across the face of the certificate is the statement "see revised cert attached to Lia-

bility Policy." UNR did not introduce any evidence as to how or for what purpose the certificates were issued to E.I. DuPont de Nemours & Co. Inc.

This space was not completed on any of the three certificates received in evidence. National Surety's underwriting manual also instructs that products coverage information must be indicated on certificates of insurance if such coverage is provided. (NS 1020, pp. 50–51, Tr. 5785–88).

UNR did not offer any direct proof of the contents of the declaration portions of the lost policies.

UNR disputed the negative documentary evidence with testimony that certificates of insurance were not always completed as the form provides and that sometimes, when products coverage was provided, the certificate was completed by typing the word "comprehensive" next to the printed words "Public Liability" as appeared on the face of the certificates in evidence. UNR's witnesses also testified that no extra premium was charged for products coverage and that products coverage was issued without aggregate limits contrary to the National Surety manual of instructions.

A National Surety witness testified that he worked on the UNR account and that no products coverage was provided. (Tr. 5746–49). National Surety also relied on letters written by UNR's brokers stating that UNR did not have products coverage until June 26, 1958 (ZE 6A, 6, 7, 13) and admissions made in pleadings by UNR that it did not have such coverage until 1958 (NS 1022; NS 1095, PC 676, pp. 11–12; PC 13; PC 296).

The jury verdict in National Surety's favor is supported by the evidence.

■ The jury found that UNR did not prove that it had a valid excuse for not giving prior notice of accidents and claims to National Surety before 1983 (Verdict No. 3). Under Illinois law UNR was required to prove compliance with insurance notice provisions by a preponderance of the evidence. *Equity General Insurance Co. v. Patis*, 119 Ill.App.3d 232, 74 Ill.Dec. 846, 849, 456 N.E.2d 348, 351 (1st Dist.1983); *INA Ins. Co. of Ill. v. City of Chicago*, 62 Ill.App.3d 80, 19 Ill.Dec. 519, 379 N.E.2d 34, 37 (1st Dist.1978); *Feder v. Midland Casualty Co.*, 316 Ill. 552, 147 N.E. 468, 470 (1925). UNR contends, however, that National Surety must prove prejudice and

that the prejudice must relate directly to claim handling. The issue in the first instance is whether UNR exercised due diligence. Lack of prejudice is a factor the insured may prove to show whether or not notice was "reasonable." *Casualty Indemnity Exchange v. Village of Crete*, 731 F.2d 457, 459 (7th Cir.1984) (absence of prejudice is not to be considered until insured shows a valid excuse for an 18 month delay).

Any policy that was issued required notice of accident "as soon as practicable" after accidents and "immediate" notice of any claim (UNR 313, 203). Policies from the 1940's time period covered only accidents that occurred during the policy period. The last possibly covered accident under any policy occurred in 1948. No inquiry was made about early insurance coverage until June, 1969. That inquiry was made to UNR's brokers. It did not include a search of UNR's own files (Tr. 6046).

All of the documents UNR relies on to prove coverage by National Surety were found in 1983 in the custody of UNR's inside corporate counsel. Given the awareness and professional training of its staff, the evidence leads to an inescapable conclusion of unexcused delay. *International Harvester Co. v. Continental Casualty Co.*, 33 Ill.App.2d 467, 179 N.E.2d 833, 835–36 (1st Dist.1962); *City of Chicago v. United States Fire Ins. Co.*, 124 Ill.App.2d 340, 260 N.E.2d 276, 279–80 (1st Dist.1970); *Ohio Casualty Ins. Co. v. Rynearson*, 507 F.2d 573, 577 (7th Cir.1974); *Mutual Benefit Health & Accident Ass'n v. Brunke*, 276 F.2d 53, 57 (5th Cir.1960).

UNR contends that National Surety issued insurance contracts without period or annual aggregates for products liability insurance from 1945 to 1949 which would expose it to more liability than any primary carrier. Many cases have been filed and settled and many more are pending since UNR was first sued in 1968. Many persons who had actual knowledge of the coverage and the claims issues are dead. Resolution of coverage issues and defense of the claims is more difficult because of the passage of time. UNR has offered no evi-

dence to counter National Surety's assertion of prejudice. UNR did not prove by a preponderance of the evidence that it had a valid excuse for not giving prior notice of accidents and claims or suits to National Surety before 1983 and did not prove that National Surety was not prejudiced by the timing of the notice given in 1983.

The issue of lost National Surety policies was fully tried to the jury. There is abundant evidence in the record to support the jury's verdicts that UNR failed to prove the existence of lost National Surety products liability insurance policies and failed to prove notice. UNR's motion for a directed verdict must be denied. The jury's verdict is not against the manifest weight of the evidence, and UNR is not entitled to a new trial on the issue of lost National Surety policies.

### (2) Verdict 9

■ Zurich, Bituminous and Continental each contended that the agreements entered into with UNR were intended to apply to cases filed but not settled as of December 31, 1981 and the jury so found (Verdict 9). UNR contends that there is no evidence which would tend to prove a meeting of the minds with respect to the application of the Houston agreement to cases reported but not settled by December 31, 1981.

UNR did not move for a directed verdict on this issue (Tr. 8504–09), and it is not entitled to move for a judgment notwithstanding the jury's verdict. Rule 50(a) Fed.R.Civ.P.; *Johnson v. University of Wisconsin–Milwaukee*, 783 F.2d 59, 61 (7th Cir.1986).

Alternatively, there is sufficient evidence in the record that the parties understood that each agreement governed cases filed during the term of that agreement, regardless of when settled. (Snyder 7713–19; McLaughlin 6935–36; Rynn 2863, 7082–84; McAleen 2570–71; Rhodes 3909; UNR 111; PC 217; UNR 158; PC 309, and PC 354). The evidence was sufficient to sustain either the Illinois or federal standards for support of a jury verdict. *Norfolk & Western Ry. Co. v. U.S. Ry. Equipment Co.*, 563 F.Supp. 747, 749 (N.D.Ill.1983), *aff'd* 753 F.2d 1078 (7th Cir.1985); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 678 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).

### (3) Verdict 10

■ The jury found that UNR did not prove that it entered into agreements with Zurich, Bituminous or Continental as a result of intentional misrepresentation either by or on behalf of Zurich, Bituminous or Continental, that C & B had shopped the insurance market prior to March 26, 1976 and that no new primary insurance coverage was available to UNR except that provided to UNR by Continental.

UNR made a timely motion for a directed verdict on this issue (Tr. 8405–09). Ruling was reserved, and it is entitled to consideration of its motion for a judgment notwithstanding the verdict.

UNR relies principally on the testimony of Robert Penn who testified at trial that at a meeting on January 20, 1976, Morton Gainer told him that C & B had "shopped the insurance market" and that there were no options except to take coverage from Continental and enter into the Houston agreement. (Tr. 593). However, at his earlier deposition, Penn testified that he could not recall any specific meeting with Gainer regarding the placement of insurance coverage (Tr. 593–94). Moreover, contemporaneous documentary evidence could have been regarded by the jury as inconsistent with Penn's testimony. The UNR Board of Director's minutes contain counsel's recommendation that the coverage be taken and that an agreement be entered into without any reference to insurance market conditions (PC 676). A memo from Penn to then chief executive officer Leavitt does not communicate a representation from C & B, but rather recommends the agreement as "the best our professional negotiators could come up with." Negotiations were conducted by UNR's outside counsel (UNR 112).

According to minutes of January 22, 1976, the UNR Board of Directors was told that "Mr. Rhodes ... called attention to the fact that he had been negotiating terms

for a new liability policy with Continental" on the following proposed basis:

 A. For all litigation pending of asbestos installer worker claims filed prior to December 31 (as of November 1, 1975), the insurers will pay 65% of the settlement or award, up to $500,000 per case and attorneys' fees, and UNARCO will pay 35%.

 B. For cases filed from and after January 1, 1976, Zurich and Bituminous insurance companies will each pay 25% and Continental will pay the balance except for $15,000 which will be deductible and payable by UNARCO as a cap.

While all the terms have not yet been negotiated, it probably would be advisable to try such insurance for at least a year in that (a) it protects the Company's excess coverage policy; (b) continues the company's relationship with an insurer or insurers who otherwise would not write such risks; and (c) would minimize some of UNARCO's liability which together with the reserves, should be financially sound for the company; and that the cost of such coverage would be an additional $125,000 over and above the existing premium of approximately $200,000 now being paid for coverage for all liability insurance.

 \* \* \* \* \* \*

... [w]ith the law changing fast and cases coming in on an accelerated basis, a general indication of the success or failure of the Company's insurance arrangements will be more clearly understood as the year 1976 terminates. In the meantime, there will not be the doubtful claims against Zurich and Bituminous and Continental who heretofore had contributed, on a "dragging the foot" basis, with reservations or with disclaimers.

(PC 676, pp. 13–14).

Rhodes described the [sharing] agreements as a "simple comparatively easy to implement, and fair method of allocating costs and losses ... among ... liability insurers" which "had the ancillary benefit of substantially reducing the costs of claim handling" (PC 296, PC 251).

UNR entered into a separate loss sharing agreement with Zurich and Bituminous on or about July 6, 1976 that did not involve Continental's coverage (PC 158). C & B had no part in these negotiations. Moreover, the evidence shows that UNR continued to enter into agreements with its primary carriers in 1977, 1978, 1979, 1980 and 1981. For part of 1980 and all of 1981 Continental did not provide any primary coverage.

There was also evidence that in 1977 a C & B executive presented to UNR an insurance plan by Royal Globe Insurance Company as an alternative to Continental coverage (Tr. 7942). Robert Maynard of UNR testified that in 1978 or 1979 he was able to obtain an alternative general liability coverage plan from Alexander & Alexander, a competing broker.

Even if the jury accepted Penn's challenged testimony and found that C & B did misrepresent that it had shopped the market and that no other products coverage was available in 1976, there is substantial evidence in the record to conclude, as the jury may have, that UNR did not rely upon any such alleged misrepresentations in entering into and extending its agreements with the primary carriers to allocate costs and losses from March 26, 1976 to December 31, 1981. Accordingly, UNR's motion for judgment notwithstanding the verdict must be denied.

### D. Bituminous's Motion for a Directed Verdict on the Issues of Exhaustion and Duty to Defend

■ At the close of all the evidence, it did not appear that there was any question of fact for the jury to consider on the issue of whether or not the policy limits of Bituminous's policies had been exhausted. Bituminous issued two general liability policies to UNR containing primary products hazard coverage between November 1, 1964 and November 1, 1970 (UNR 557, 558). The policies contain aggregate indemnity limits of $500,000 for each of the six policy years. Bituminous paid $3,015,002.17 in products claims on behalf of UNR as of July 9, 1982 (PC 617(a); Lavin 7821). On August 3, 1982, Bituminous gave notice

to UNR that its policy limits were exhausted as of July 9, 1982 (PC 446; Lavin 7821–22).

Bituminous allocated non-asbestos and asbestos-related indemnity payments to the six policy years so as to exhaust each year simultaneously when the last dollar was paid (Lavin 7823). UNR's attorney, Rhodes, gave consent to simultaneous exhaustion, provided that Commercial Union, the excess carrier did not object (Rhodes 3927, 3939–40; Lavin 7823).

One of the objectives of the allocation agreements was to eliminate the need to determine exact exposure dates during underlying claim discovery or at a trial. It was agreed that the parties would be governed by the allegations of each complaint. If exposure was alleged during an insurer's period of responsibility, responsibility would be assumed for a share of a settlement or loss (McLaughlin 6830–32; Rhodes 3809, 4090). Rhodes testified that it would be impossible to determine exact exposure dates short of trial (Tr. 3942). Lavin testified that because of the parties' allocation agreement Bituminous's files do not contain exact exposure dates (Tr. 7824).

Commercial Union provides products liability coverage in excess of Bituminous. Commercial Union did not disagree with Bituminous's method of allocation. (Lavin 7867–70). On June 20, 1986, Commercial Union settled its dispute with UNR concerning its coverage.

Bituminous was entitled to a directed verdict that it exhausted its coverage liability to UNR on July 9, 1982 and is entitled to declaratory relief that as of that date it has no further liability or defense obligations to UNR. This ruling, however, will not resolve any issue with respect to any share of unpaid defense costs that may be due UNR pursuant to Bituminous's allocation agreements with UNR.

E. UNR's Motion for a New Trial

**(1) Limitation of Phase I Issues with Respect to C & B**

■ On the fourth trial day, UNR took the position that the Phase I trial should include its negligence, malpractice, fiduciary and bad faith tort claims against C & B. UNR asserted that it proposed to offer all of its evidence relating to its claims against C & B as part of its claim of the invalidity of any Houston agreement because of intentional misrepresentation. All tort and breach of contract claims had previously been severed without objection by UNR (Tr. 11/27/85).

Discovery on issues other than the expedited issues had not been completed when discovery was closed on November 27, 1985. UNR's belated request to try its tort claims against C & B (but not the other defendants) had not been considered or agreed to by the parties or by the court. To have permitted a change in procedure would have extended and changed the nature of the already complex trial without proper notice or preparation. UNR is not entitled to a new trial because it was not permitted to try its tort claims against C & B during the Phase I trial. Those claims must be considered in later proceedings.

**(2) Verdict by a Jury of Eight Jurors**

■ UNR contends that the submission of the issues to a jury of more than six persons was erroneous and invalidates the trial. The parties, including UNR, stipulated before the trial began that alternates would deliberate. However, at the end of the trial, when the verdict form providing a place for the signature of eight voting jurors (six regular jurors and the remaining two of four alternates) was circulated for comment, UNR took the position that it agreed only that alternates could deliberate but not that they could vote.

Rule 48 of the Federal Rules of Civil Procedure provides that the parties to a civil lawsuit may stipulate that a jury may consist of any number less than twelve. Civil Rule 23 of this court provides for a jury of six persons. General Rule 5.00 of this court establishes the form for pretrial orders. It includes a requirement that the parties indicate to the court whether alternates "will" or "will not deliberate" (See *Sullivan's Law Directory,* p. 203c, 1986 Edition).

The draft final pretrial order submitted to the court in this case contains the following statement:

Certain defendants may request that the case be tried to more than a six-person jury. The parties are not in agreement that alternates will deliberate.

The issue of whether alternates would deliberate was then discussed at a pretrial conference on March 9, 1987 and the order issued as a result of that conference states as follows:

> The parties shall inform the court at the final pretrial conference on March 11, 1987 whether they want the alternates to deliberate. If the parties cannot agree on whether the alternates will deliberate, the court will excuse the alternates and allow only six jurors to deliberate.

At a pretrial conference held on March 11, 1987 at 2:00 p.m., the parties informed the court of their agreement that the alternates would deliberate.

It is common practice in this court for parties to agree that alternates will deliberate. Many observers believe that there is a greater dynamic in jury discussions when the jury is composed of groups larger than six. Moreover, in this as in many cases, the burden of proof falls on different parties on different issues. In this case, because of the projected length of the trial, four alternates were selected with six regular jurors.

Neither the defendants nor the court interpreted the parties' stipulation that alternates would deliberate as an agreement that alternates could participate in the deliberations but not vote as jurors. Such a procedure would violate standard practice that only the jury may be present when a verdict is discussed. Rule 47(b) of the Federal Rules of Civil Procedure, requires that alternates "shall be discharged when the jury retires to consider its verdict." Those who participate in jury deliberations are members of the jury and must vote.

The parties and the court's understanding that the deliberating jury would consist of the six regular jurors and any remaining alternates up to ten is also shown by the following statement in the record when the jury was being selected on March 12, 1987:

> MR. THOMAS [Counsel for UNR]: May I ask one question? If an alternate must serve, would they be called in this order or would they be called at random?
>
> THE COURT: Now the alternates all deliberate. That was the stipulation. But they are all eligible to deliberate because of your stipulation, and the alternates fill in in the order in which [chosen]—I could theoretically end up with only six, but any four could be excused. I won't ask for a verdict from less than six or more than ten. Okay?
>
> All right, gentlemen, are you ready?
>
> MR. THOMAS: Yes, your Honor.

(Tr. 105).

Given the record, there is no basis to interpret the parties' stipulation that alternates would deliberate as an understanding only that alternates would participate in the deliberations but not vote with respect to the jury's verdict. *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 514–15 (4th Cir.1985).

### (3) UNR's Motion for a New Trial with Respect to National Surety

■ UNR argues that it should not have been required to prove the existence of any products exclusion contained in any National Surety policy issued to it. It claims that applicable Illinois law requires that an insurance company must prove an exclusion of coverage from a comprehensive liability policy.

The jury was instructed that UNR had the burden of proving the material terms of any lost insurance policies. Proof of material terms includes the existence of products coverage. *Cobbins v. General Accident Fire and Life Assur. Corp., Ltd.*, 53 Ill.2d 285, 290 N.E.2d 873 (1972); *U.S. Sanitary Specialties Corp. v. Globe Indemnity Co.*, 204 F.2d 774 (7th Cir.1953); *Keene Corp. v. Ins. Co. of North America*, 1981 Fire and Cas.Rep. 712 (D.D.C.1981) [Available on WESTLAW, 1981 WL 1753]; *Littrall v. Indemnity Ins. Co. of North America*, 300 F.2d 340 (7th Cir.1962), *cert. denied*, 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed. 2d 499 (1962).

UNR was not required to prove that there was no exclusion of the products hazard from the National Surety policies. Rather, it was required to prove the con-

tents of the lost policies, including any exclusion. All of the forms on which it relied could have been used with or without products coverage. UNR was not entitled to a presumption that coverage was provided or to an instruction shifting the burden to prove an exclusion to National Surety. Any such presumption or burden would be particularly inappropriate in this case; the certificates on which UNR relies indicate on their face that products coverage was not provided. It was only by the admission of extrinsic evidence that UNR was able to argue that products coverage may have been provided contrary to the documents.

The testimony of Stephen Steel, a former UNR employee with knowledge of UNR's practices, and the testimony of certain insurance brokers concerning industry practices with respect to certificates of insurance, was refused. Steel did not claim to have a direct recollection of the contents of any National Surety policy or knowledge of the purpose for issuing any certificates of insurance which were in evidence. The parties were, however, permitted to call a number of former National Surety employees with respect to National Surety practices. UNR's evidence with regard to practices and general industry practices was cumulative and of little or no probative value with respect to the actual contents of the lost National Surety policies.

UNR sought to prove constructive notice to National Surety because it was an insurer on behalf of another party in *Borel v. Fiberboard,* a case in which UNR was a party, and because UNR had given notice of accidents and claims to brokers who also represented Fireman's Fund and National Surety. Since none of that evidence would have shown that UNR was seeking to give actual notice to National Surety of claims or accidents, this evidence was properly refused. *Hartford Accident & Indemnity Co. v. Gulf Ins. Co.,* 776 F.2d 1380 (7th Cir.1985); *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260 (7th Cir.1986); *INA Ins. Co. of Ill. v. City of Chicago,* 62 Ill.App.3d 80, 19 Ill.Dec. 519, 379 N.E.2d 34 (1st Dist. 1978); *Employers' Liability Assurance*

*Corp. v. Travelers Ins. Co.,* 411 F.2d 862 (2d Cir.1969).

UNR is not entitled to a new trial with respect to insurance coverage provided by National Surety.

**(4) Errors Claimed with Respect to the Houston Agreement—Verdict No. 8**

Since 1980, essentially three different theories of coverage have been announced by courts dealing with products liability insurance of asbestos claims.[8] Each theory is based upon standard policy language which is substantially as follows:

### Coverage

The (insurance) company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... caused by an occurrence....

### Definitions

"Bodily injury" means bodily injury, sickness or disease sustained by any person.

\* \* \* \* \* \*

"Occurrence" means an accident, including injurious exposure to conditions which results in bodily injury during the policy period neither expected nor intended from the standpoint of the insured.

The "exposure theory" was first adopted by the Sixth Circuit in *Insurance Co. of North America v. Forty–Eight Insulations,* 633 F.2d 1212 (6th Cir.1980), *clarified,* 657 F.2d 814, *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) as an interpretation of Illinois law. This theory was later adopted by the Fifth Circuit in *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) and by the Eleventh Circuit in *Commercial Union Insurance Co. v. Sepco Corp.,* 765 F.2d 1543 (11th Cir.1985). Under the exposure theory, coverage is based solely on the claimant's period of exposure to asbestos. If the exposure occurs during the policy period of more than one carrier,

---

**8.** For an overview of the nature of asbestos injuries, see T. Willging, *Trends in Asbestos Liti-* *gation,* pp. 5–12 (Federal Judicial Center 1987).

the coverage and defense obligations are to be apportioned *pro rata* among the carriers on the risk during any period of exposure. Proponents of this theory contend that bodily injury takes place at or shortly after exposure to asbestos.

The "manifestation theory" was adopted by the First Circuit in *Eagle–Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). Under this theory, coverage and defense obligations are not triggered until the occurrence insured against has manifested itself in such manner as to be medically detectable and diagnosable. Proponents of this theory assert that a court must focus on the word "disease" rather than bodily injury. They contend that asbestos-related diseases are undiagnosable until an individual has recognizable symptoms, which may be as long as 20 to 40 years after exposure if exposure actually produces a disease.

A third or hybrid theory was stated by the D.C. Circuit in *Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). The *Keene* court held that coverage is triggered by injury and that such injury occurs from first inhalation of asbestos through exposure and until clinical manifestation of an asbestos-related disease. This theory provides the maximum amount of insurance coverage. The *Keene* theory was adopted by the Third Circuit in *ACandS, Inc. v. Aetna Casualty & Surety Co.*, 764 F.2d 968 (3d Cir.1985). However, the theory has not been consistently applied in the D.C. Circuit. *See Abex Corporation v. Maryland Casualty Co.*, 790 F.2d 119 (D.C.Cir.1986); *Owens–Illinois, Inc. v. Aetna Casualty & Surety Co.*, 597 F.Supp. 1515 (D.D.C.1984), appeal pending D.C.Cir.

On May 27, 1986, the Illinois Appellate Court, First District, decided the case of *Zurich Insurance Co. v. Northbrook Excess & Surplus Insurance Co.*, 145 Ill. App.3d 175, 98 Ill.Dec. 512, 494 N.E.2d 634 (1st Dist.1986). The Appellate Court decided that asbestos-related claims trigger policies in effect during exposure and at the time of manifestation of sickness or disease, but not those in effect during any post-exposure, pre-manifestation latency period. The court further held that a primary insurer is not obligated to continue to fund the defense of pending actions once its duty to indemnify has been terminated by the payments of judgments or settlements and the insurer has made an orderly withdrawal from pending proceedings. The principal of *pro rata* allocation of costs of defense and indemnity among the triggered policies was rejected.

The Illinois Supreme Court granted petitions for leave to appeal filed by both the insured and the insurers in the *Zurich* case. On September 15, 1987, the Illinois Supreme Court rendered its decision affirming the judgment of the Appellate Court. *Zurich Insurance Company, et al. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987). The Illinois Supreme Court found the language of the policies in dispute to be unambiguous. The Court stated:

... [W]e hold that under the plain and unambiguous language of the policies at issue, the insurer must provide coverage of asbestos-related claims if the claimant in the underlying action suffered 'bodily injury', 'sickness', or 'disease' during the policy period. 'Bodily injury' takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos. Thus, an insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage. 'Disease' takes place when it is reasonably capable of clinical detection and diagnosis. The determination of when a claimant's disease was reasonably capable of diagnosis must be made on a case-by-case basis. 'Sickness' takes place at any time during which the claimant suffers from a disordered, weakened or unsound condition before the clinical manifestation of a disease. Whether and when a claimant suffered 'sickness' must be determined on a case-by-case basis.

(514 N.E.2d at 161). The Court rejected the exposure *pro rata* allocation approach adopted by the Court of Appeals in *Insur-*

*ance Company of North America v. Forty–Eight Insulations, Inc., supra* and also rejected the post-exposure pre-manifestation latency period of exposure approach found in *Keene, supra.*

UNR claims that error was committed at the trial of this case with respect to jury instructions, the form of verdict and the exclusion of evidence. UNR contends that the jury should have been informed of Illinois law with respect to the triggers of insurance coverage of asbestos claims and the insurer's duty to defend based on the Appellate Court decision in the *Zurich* case. UNR also contends that a question asked by the jury during deliberations was not correctly answered and that it was precluded from proving how it was injured by the Houston agreement.

During the period 1976–1981 UNR was represented in the negotiations with the primary carriers by attorney C. Harker Rhodes, Jr. Mr. Rhodes testified at great length at the trial and was permitted to explain fully his discussions with insurance company representatives and his understanding of applicable law during these discussions. Mr. Rhodes was an articulate, intelligent and candid witness. He presented his views to the UNR Board of Directors (quoted at pages 1444–1445 of this opinion), drafted the letter agreements among the parties and expressed his views in writing to the carriers and to UNR.

In 1979, Rhodes wrote with respect to the Houston agreement as follows:

The product liability insurance policy which was written 21 years ago when Unarco first took out product liability coverage clearly did not contemplate claims involving installers and shipyard workers who would contend they were intermittently exposed to Unarco products from, for example, 1934 to, say, 1976, and thereafter became ill within the past two years or so (to comply with local statutes of limitations). Furthermore, Zurich Insurance Company wrote a number of policies during successive years and was then followed by Bituminous, which likewise wrote successive policies. Bituminous in turn was replaced by Continental which, after a few years, included deductibles for claims

first asserted in particular policy years. The aggregate limits of the various insurance policies have also been reduced by losses resulting from non-asbestos claims. Unarco has carried excess liability insurance during some, but not all, of the years in which it carried primary coverage and of course there were many years when Unarco had no coverage at all.

General counsel, on behalf of Unarco, negotiated the so-called "Houston Agreement" with Unarco's primary insurers which over the years has evolved into a working arrangement designed to insure that Unarco will ultimately receive the entire aggregate limit from the Zurich and Bituminous insurance companies and will result in securing the maximum contribution from Unarco's insurers to the costs and expenses of the litigation. While other manufacturers have been involved in declaratory judgment litigation with their insurers to determine the respective obligations of the insurers and the insured, Unarco's insurers have permitted Unarco general counsel to manage the mass asbestos litigation with virtually no friction and with a reimbursement to Unarco of up to 50% of the losses and costs of the litigation.

The Houston Agreement, which has served Unarco so admirably, does not however cover all of the facets of Unarco's relationship with its insurers and as time progresses the questions presented have become more complicated with less and less guidance from the reported cases. Unarco's relationship with its insurers has in large measure been directed by very practical considerations and a sensitivity to the problems of the insurers with their re-insurers and state insurance departments. In turn, Unarco has been rewarded by a substantial sensitivity on the part of the insurers to the needs of Unarco.

The prospective involvement of Unarco's excess insurers obviously raises a host of new problems which are not readily answerable by a mere reading of the language of the policies and a reference to applicable state law. Some of

the unanswered questions involve the problems of allocation of losses to particular policy periods, obligations of the insurers to provide a defense, and the mechanics of the apportionment of these expenses, the frequency of accountings and reimbursement among the insurers themselves and Unarco, and so on.

So far Unarco's relationships with its insurers has been handled with considerable candor and mutual trust between the parties, which has resulted in requiring far less legal expense to Unarco than would be the case if the individuals involved had not had a long experience with each other.

(PC 418, pp. 11–13).

Following the decision of the Court of Appeals in *Forty–Eight Insulations,* Rhodes recommended that UNR support the decision before the United States Supreme Court. In a letter to UNR he stated:

Unarco is in a position to submit a brief suggesting to the Supreme Court that the myriad of practical problems alluded to by the petitioners' attorneys can easily be resolved under the doctrine of *INA v. 48 Insulations;* and that Unarco, as an example, resolved many years ago its problems of apportionment of losses and costs among its insurers and itself in a very practical and comparatively inexpensive fashion which in addition was quite consistent with the language of the policies which the Supreme Court is being called upon to interpret.

(PC 623, p. 2).

On July 10, 1981, writing to an attorney for one of the excess insurance carriers, Rhodes stated:

I will not lengthen this letter by a renewed recital of the Houston Agreement and how it worked successfully for many years. While it may seemingly be complicated it is actually a quite intelligible method of claims handling and loss and cost apportionment which anticipated the decision in *INA v. Forty–Eight Insulations* by a number of years and was far simpler to administer than the rule in *INA v. Forty–Eight Insulations,* which requires separate calculations as to every claim. Perhaps it is only a matter of

personal pride but at the time the Houston Agreement evolved I thought we had done our client and its insurers a remarkable service in working out a system which so greatly facilitated the handling of what has now turned out to be thousands of lawsuits.

Probably the only thing I would do over would be to have involved the excess insurers in the negotiations which resulted in the Houston Agreement.

(PC 360, p. 2).

On October 1, 1981, the Court of Appeals for the District of Columbia decided the *Keene* case. On October 6, 1981, Rhodes wrote a memo suggesting the possible termination or rescission of the Houston agreement based on a mistake of law:

On October 6, 1981 I learned from Jim Restivo that the Court of Appeals for the District of Columbia had ruled in *Keene v. INA* that period of exposure, period of damage to the environment, date of manifestation, and just about everything else, triggered coverage—and further that the insured was not obligated to contribute to its own defense but its insurers were obliged to pay the entire cost of defense.

Unarco entered into a series of agreements with Zurich, Bituminous, and Continental under which the parties explicitly agreed that the cost of defense would be shared in proportion to the contribution to indemnity. It was also agreed that this agreement was reviewable annually and was terminable on some reasonable but short notice such as, I believe, 30 or 60 days.

In the light of these very explicit understandings I do not believe that Unarco could go back and secure the cost of defense which it has heretofore paid in the asbestos cases. This is particularly true since the payments were made under very clear agreements and the position that we all took was entirely consistent with the ruling of the Court of Appeals in *INA v. Forty–Eight Insulations.* However, in the light of the apparent decision in the *Keene* case there is nothing to prevent Unarco from now ask-

ing for a new agreement with its insurers.

Zurich, Bituminous and Continental still have not exhausted their underlying coverage and reopening this matter is not the equivalent of reopening a closed file—at least as to the future.

I have as yet not had an opportunity to see what formula the D.C. Court of Appeals suggests for the apportionment of costs of defense. The time may be coming to use a strict period of exposure rather than the easy formulas which we have had so far. This leads to certain fairly obvious questions: in cases where the last pleaded exposure was prior to 1958, can we hold in any carrier? If the loss was manifested in 1980, can we collect the cost of defense entirely from Continental? What are the provisions of the deductible for 1976 through 1979 with Continental as respects cost of defense?

As respects the Home Insurance Company it would clearly be to Unarco's benefit to adopt the position that Zurich, Bituminous and Continental—particularly Continental—never exhaust their duty to defend and therefore the ultimate net loss for which the Home is responsible would be used entirely for indemnity. This would appear to make the Home policy much more valuable since others would be paying Unarco's cost of defense.

In ascertaining the ultimate net loss for Home can we consider the pro rata cost of defense in calculating the Home's obligations for 1976?

What effect does the increased liability of Continental have for cost of defense for 1974 and 1975 vis-a-vis the Home's liability for those years.

In terms of assessing the primary carriers—and perhaps the Home—for cost of defense, is it feasible to set a cut-off date such as October 6 or October 10, or even November 1, and ask all of the defense attorneys to submit bills through those dates and to keep separate track of their time thereafter so that all bills for fees can be directed to insurers after the cut-off date.

What are the other manufacturers doing?

Commencing January 1, 1981 is the Unarco computer capable of prorating the period of exposure over the various carriers so that for suits filed in 1981 (and possibly 1980) the indemnity and perhaps the cost of defense can be allocated?

Ought we to call a meeting of all of our carriers, primary and excess, to discuss the new ground rules. Should we send a letter first outlining the new proposals in the light of the *Keene* decision.

Bituminous believes that once its coverage is exhausted its duty to defend will likewise be terminated. Kroll tells me that the Supreme Court of Illinois has yet to act on a petition for leave to appeal on the question of the obligation of an insurer to continue to provide a defense even though the underlying coverage is exhausted. While this position seems inequitable it offers a tremendous bargaining point against Bituminous, and certainly against Zurich—after all, as the law is that Bituminous, under its defense policy, does have an obligation to provide a defense after the underlying coverage is exhausted, our previous agreements would have been without consideration, Bituminous would not have acted to its detriment, and indeed, it is Unarco that has been paying a portion of Bituminous' obligation over the years.

If all of the Houston Agreements are to be rescinded, then Zurich and Bituminous owe Unarco reimbursement for the amounts which Unarco has spent for the cost of defense—an intriguing thought. (PC 406).

On October 20, 1981, UNR held a meeting with its primary carriers at which it indicated its desire to substitute the Houston agreement with the *Keene* decision approach to increase carrier responsibility. UNR stressed the *Keene* decision's holding that any carrier on the risk must provide the full cost of defense and that the insurer may choose which carrier to tender such obligation.

The primary carriers did not accept UNR's proposals and the Houston agreement was not renewed after December 31, 1981. (The parties do not dispute, however, that the interpretation of unexhausted primary coverage as to cases filed after December 31, 1981 is governed by the Illinois Supreme Court's decision in the *Zurich* case.)

With respect to the Houston agreement, the jury was instructed as follows:

Zurich, Bituminous and Continental each claim that agreements with UNR described in Verdicts 8 and 9 compromised and settled good faith differences of opinion or uncertainties concerning the interpretation and application of insurance policies issued to UNR by Zurich and Bituminous and, in the case of Continental, of insurance policies issued and to be issued to UNR. Valid agreements of this kind may be made.

In order to find valid agreements to compromise and settle good faith differences of opinions or uncertainties concerning the insurance policies, each defendant must prove by a preponderance of the evidence that:

(1) There was a good faith difference of opinion or uncertainty between that insurer and UNR concerning the interpretation and application of its insurance policies.

(2) Each of the parties agreed to each of the material terms of each agreement for the purpose of resolving specific uncertainties.

The jury was further instructed as follows:

During the trial several witnesses have testified as to their understanding of Illinois law. The law in Illinois has never been finally resolved or settled with respect to insurance coverage for asbestos cases.

UNR argues that when this case was submitted to the jury in May of 1987, it was entitled to an instruction describing the holdings of the Illinois Appellate Court in the *Zurich* case. However, the *Zurich* case was pending on review before the Illinois Supreme Court, and the Illinois law was not settled or resolved until the Supreme Court ruled in September of 1987. Moreover, the state of the law and UNR's position changed during the time of the Houston agreement. UNR first supported the *Forty-Eight Insulations* position but later adopted the *Keene* decision. Neither decision was followed by the Illinois courts. The relevant factor for jury consideration was not the precise holding of the Illinois Appellate Court in May of 1986, but the status of the law when the parties entered into the Houston agreement or any extension. Because the parties were permitted to advance their differing views of the applicable law, the jury was entitled to know that the legal issues discussed had not been finally resolved when it considered the testimony relating to negotiations.

UNR's additional contention that the court improperly refused to instruct the jury on the meaning of good faith is not supported by the record. UNR did not include any such instruction in "UNR's Suggested Modifications and Supplements" dated May 18, 1987, nor did counsel object to such an exclusion on May 18, 1987. UNR was permitted to argue to the jury that insurer greed and bad faith motivated denial of policy obligations.

 UNR claims that the jury should have been instructed that under Illinois law it was entitled to full defense and full indemnity in asbestos cases. No such suggestion appears in its proposed instructions, modifications or statements (Tr. 8825–26). UNR's suggested modification (p. 20) to the instruction dealing with the uncertainty of Illinois law was accepted. Moreover, such an instruction would not have been a proper reflection of Illinois law when the Houston agreements were negotiated.

### (5) Contract Interpretation and Performance Instructions

 UNR proposed instructing the jury that insurance policy ambiguities are resolved in favor of the insured. However, this rule of contract construction was not relevant to any fact issue submitted to the jury. Contract construction is a question of law for a court. The jury's function was

**1454**

to determine disputes with respect to extrinsic evidence. *City of Clinton v. Moffitt*, 812 F.2d 341, 344 (7th Cir.1987).

The element of performance was improperly omitted from the court's instruction regarding the Houston agreement, according to UNR. However, UNR's proposed modifications of the jury instruction did not include such a suggestion. Moreover, performance of the Houston agreements was not a Phase I issue.

### (6) The Question from the Jury

■ During jury deliberations the jury sent a question to the court which was as follows:

Could you please give us "the jury" clarification on Question No. 12 and No. 14 as to what right or claims are given up.

(Tr. 9502).

In verdict form, Question 12 is as follows:

12. Do you find that Zurich, Bituminous or Continental proved by clear and convincing evidence that UNR voluntarily and intentionally gave up the right to now claim different treatment from Zurich, Bituminous or Continental for asbestos claims under its insurance policies?

With respect to Verdict 12 the jury was instructed as follows:

Zurich, Bituminous and Continental each contend that UNR waived any right to claim different benefits under each of its insurance policies. A waiver is a voluntary and intentional giving up of a known right.

To prevail on their claims of waiver, Zurich, Bituminous and Continental must prove by clear and convincing evidence that UNR voluntarily and intentionally gave up the right to now claim different benefits under its insurance policies issued by Zurich, Bituminous and Continental.

If you find that Zurich, Bituminous or Continental carried its burden of proof on this defense, then you must find in that defendant's favor and against UNR with respect to Verdict 12. If, however, you find that Zurich, Bituminous or Continental failed to carry its burden of

proof on this defense, then you must find in UNR's favor and against that defendant with respect to Verdict 12.

In Verdict form, Question 14 is as follows:

14. Do you find that Zurich, Bituminous or Continental proved by clear and convincing evidence that UNR is barred from pursuing its claims against it because it relied in good faith to its detriment on UNR's conduct in entering into the agreements?

With respect to Verdict 14 the jury was instructed as follows:

Zurich, Bituminous and Continental contend that UNR is prevented from pursuing its claims against them because they relied in good faith on UNR's entering into agreements and have incurred some detriment because of their reliance. Zurich, Bituminous and Continental must each prove by clear and convincing evidence its (1) good faith reliance on the conduct of UNR; and (2) change of position to its detriment.

If you find that Zurich, Bituminous or Continental carried its burden of proof on each element of this defense then you must find in that defendant's favor with respect to Verdict 14. If, however, you find that Zurich, Bituminous or Continental failed to carry any element of its burden of proof on this defense, then you must find in UNR's favor and against that defendant with respect to Verdict 14.

When the question was received from the jury, UNR suggested that the court instruct the jury on Illinois law based on the Illinois Appellate Court's decision in the *Zurich* case. UNR also specifically proposed that the answer to the jury's question be as follows:

If the jury answers Questions 12 and 14 "No," then UNR's rights under its insurance policies will be decided by the court under Illinois law.

If the jury answers Questions 12 and 14 "Yes," then UNR will be giving up that right.

(Tr. 9502–03).

The answer proposed by UNR was not responsive to the questions asked and could

have led to confusion on the part of the jury with respect to legal matters. While both sides were permitted to relate their negotiations leading to the Houston agreements and were permitted briefly to describe their legal theories, the correctness of any legal theory was not a matter for consideration by the jury. The jury had been instructed that Illinois law was not resolved. To have instructed the jury on the posture of Illinois law after the Appellate Court's opinion in the *Zurich* case would have injected possible error into the case,[9] and added a factor to the parties' earlier negotiations that did not exist when those negotiations occurred.

Accordingly, the jury question was answered as follows:

The right referred to in Verdict No. 12 is the right of UNR to claim any benefits under UNR's insurance policies which were allegedly waived or given up by any so-called Houston agreement or agreements.

The claims referred to in Verdict No. 14 are the claims of UNR of intentional misrepresentation of fact referred to in Verdict No. 10, and the claim of mutual mistake of fact referred to in Verdict No. 11.

(Tr. 9511–16). By the response given, the jury was referred back to the rights and claims as presented to them in the instructions and verdicts.

UNR is not entitled to a new trial because the court refused its proposed response to the jury's question.

## (7) Evidence of Injury to UNR Under the Houston agreements

 Concern is expressed by UNR that the jury did not know how it was injured by the Houston agreements because the court did not take proof on the issue of breach of those agreements as claimed by UNR. Breach was not a Phase I issue, and whether the Houston agreement turned out to be favorable or unfavorable to UNR was not

relevant to the issue of validity. In any event, the jury had before it the contention that the Houston agreement had cost UNR millions of dollars in the light of the holding in the *Keene* case. UNR was permitted to show the number of cases filed against it and to urge its view that the Houston agreements were not favorable to it.

## (8) Refused Conspiracy Instruction

 In relation to its claim of misrepresentation by C & B, UNR contends that the jury should have been instructed on the liability of co-conspirators for acts performed in furtherance of a conspiracy. It also contends that the jury was improperly required to find "that Continental, Zurich and Bituminous caused Corroon & Black to misrepresent a material fact" thus implying that "UNR had to prove an express agreement among the co-conspirators and that each participant ... knew the extent of the plan and the identity of the co-conspirators."

None of UNR's tort claims against any defendant was submitted to the jury. It would have been improperly confusing to have introduced the tort concept of conspiracy for the sole purpose of applying an agency concept that was already embodied in an instruction (given substantially as UNR proposed, Modifications pp. 18–19) stating:

Whether or not Zurich, Bituminous and Continental acted or intended to act individually or jointly on behalf of each other or by and through Corroon & Black in their dealings with UNR is a question of fact for you to determine. If you find that UNR has proved by a preponderance of the evidence that any or all of such parties did act or intend to act jointly or by and through Corroon & Black, then any such party is equally respon-

9. This court was required to respect the contrary Sixth Circuit's opinion in *Insurance Company of North America v. Forty–Eight Insulations Company, Inc.,* 633 F.2d 1212 (6th Cir.1980), *op. on reh'g* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), as a correct statement of Illinois law. *Colby v.*

*J.C. Penney Co., Inc.,* 811 F.2d 1119 (7th Cir. 1987); *Richards v. Local 134, Int'l Brotherhood of Elec. Workers,* 790 F.2d 633, 636 (7th Cir. 1986). Intermediate state appellate court decisions are, however, not binding on a federal court. *Williams, McCarthy, etc. v. Northwestern Nat. Ins.,* 750 F.2d 619, 624 (7th Cir.1984).

sible for the acts of such other party, or of Corroon & Black.

### (9) Other Refused Submissions

 UNR contends that the court erroneously refused instructions concerning C & B's conflict of interest and alleged misrepresentations by C & B concerning the availability of excess coverage. UNR also contends that Continental's "threat" to negate UNR's 1970–75 insurance coverage for failure of UNR to disclose in 1970 its potential liability for asbestos claims was fraudulent and made to induce UNR to enter into the Houston agreements and should have been submitted to the jury.

UNR's contentions with respect to a conflict of interest on the part of C & B because it earned a large premium from the placing of coverage with Continental is a matter UNR was able to put before the jury both in evidence and in argument. It did not require an instruction. Any instruction would have been an improper comment on the evidence.

No alleged misrepresentation by C & B concerning excess coverage related in any way to a Houston agreement. No showing was made that UNR lost any excess coverage by virtue of any Houston agreement. There was no basis for a jury finding on this matter.

During negotiations with UNR in 1976, Continental advised UNR that it did not believe it was insuring against asbestos claims in 1970. It is undisputed that Continental did not charge a premium for asbestos risks in 1970. Gainer, of C & B, stated that C & B, as UNR's broker, had been less than candid with Continental in 1970 concerning asbestos risks. Continental's underwriters were told by C & B only that UNR had gone out of the asbestos business. It was not told that UNR had been sued in 1968 and in 1969 in the *Tomplait, Parker, Potter* and *Borel* cases or that UNR and its lawyers anticipated that additional asbestos claims would be made (Tr. 6072–73, PC 13B). Arguably, when UNR obtained coverage from Continental in 1970 it should have given immediate notice of "accidents," but it did not do so.

Rhodes ignored Continental's statement in 1976 that it had not underwritten asbestos claims in 1970, because its products coverage contained no such limitation or exclusion.

There was no basis to present to the jury the question of whether Continental's "threat" to cancel or rescind was fraudulent. There was no evidence of any false statement made by Continental or by C & B on Continental's behalf, nor was there any evidence that UNR relied on any false threat in entering into any Houston agreement.

### (10) The Form of Verdict

 Objection is made by UNR to the form of verdict submitted to the jury describing the Houston agreement. UNR complains that it was taken (without direct reference) from a letter it disputes. The letter UNR refers to is a letter written by its outside counsel, Mr. Rhodes, to the inside corporate counsel of UNR summarizing the Houston agreement (PC. 354). The fact that UNR sought to repudiate Rhodes' statement of the agreement is not a reason for rejecting the language of that letter as a statement and summary of the terms of the agreements advanced by the primary carriers who bore the burden of proof on that issue. Its use did not prevent UNR from disputing the existence or terms of such agreements.

UNR's motion for a new trial must be denied.

### III.

*Contract Interpretation Issues Raised in Pretrial Briefs*

#### A. Issues to be Resolved

The parties were ordered to state their views in pretrial briefs with respect to any contract provisions in dispute which any party contended was unambiguous. After examination of the briefs it appears that further consideration should be given to the issues raised with the exception of the issue of aggregate products coverage for periods less than one year raised by UNR, Zurich and First State. The issue is also raised with respect to coverage provided by Continental. However, the presentations in the Continental and UNR briefs are in-

sufficient to provide a basis for a ruling on the Continental provision at this time.

Other issues, including the effect of the Houston Agreement on excess and umbrella carriers, Northbrook's "asbestosis" exclusion and Home's "contamination and pollution exclusion" will be considered in the next phase of this case.[10]

B. The Zurich Fractional Year Policies

■ During the time Zurich provided products liability coverage to UNR from 1958 to 1964 it issued three policies for periods shorter than one year. Each policy contains the statement that the limits of liability for the policy period is "500 thousand dollars aggregate products" in the Declarations provision. Zurich contends, however, that because each such policy is for a fractional year period, the aggregate products coverage must be limited to the same fraction. The result proposed by Zurich is as follows.

| Coverage Period | | Policy Aggr. Limit | Fractional Limit |
|---|---|---|---|
| 6–26–58 / 1–1–59 | | $ 500,000 | $258,904 |
| 1–1–61 / 4–1–61 | | 500,000 | 123,288 |
| 4–1–64 /11–1–64 | | 500,000 | 294,520 |
| | Total | $1,500,000 | $676,712 |

---

**10.** On January 6, 1988, UNR moved that the following issues be removed from this case and referred to the Bankruptcy Court: (1) whether, under the terms of the excess insurance policies, payments by the insured trigger the obligations of the excess insurers to pay for losses above the underlying limits; (2) whether, under the terms of the excess insurance policies, deductibles which are applicable to the primary policies are incorporated or otherwise included in the excess policies; (3) whether, under the terms of the primary and excess insurer policies, aggregate limits are reduced for policy periods of less than one year. UNR contends that each of the questions is an issue of law. The third question is partially resolved in this opinion. The other two questions are among the issues raised by the pleadings in this case after the case was withdrawn from the bankruptcy court and will be resolved in the next phase of this case. Remanding these issues to the bankruptcy court with the possibility of a later appeal to this court will not conserve judicial resources, save time or save expense.

The policy provisions relevant to the dis- pute are as follows:

Declarations

Item 2. Policy Period:

From _____ (date) _____ To _____ (date) _____

Item 3. The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be stated herein, subject to all the terms of this policy having reference thereto.

| Coverages | Limits of Liability | Advance Premiums |
|---|---|---|
| Bodily Injury Liability | 500 thousand dollars each person | |
| | 500 thousand dollars each accident | |
| | 500 thousand dollars aggregate products | $ (amount as stated) |

**Conditions**

5. Limits of Liability-Products. Subject to the limit of liability with respect to "each accident," the limits of bodily injury liability and property damage liability stated in the declarations as "aggregate products" are respectively the total limits of the company's liability for all damages arising out of the products hazard. . . .

\* \* \*

14. Three Year Policy Period. A policy period of three years is comprised of three consecutive annual periods. Computation and adjustment of earned premiums should be made at the end of each annual period. Aggregate limits of liability as stated in this policy should apply separately to each annual period.

\* \* \*

17. Cancellation.–

\* \* \*

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premiums shall be computed pro rata.

---

The policy issued to UNR on January 1, 1958 provided coverage for the period January 1, 1958 to January 1, 1961. This policy did not provide products liability coverage and was cancelled on June 26, 1958 when the policy was rewritten to provide products coverage. The period of the new policy was for the remainder of 1958 as indicated above. A policy written effective January 1, 1961 through January 1, 1964 was cancelled in April of 1961 and was followed by a policy from April 1, 1961 through April 1, 1964. The final Zurich policy was issued for the period commencing April 1, 1964 and concluding April 1, 1967. This policy was cancelled on November 1, 1964.

Zurich bases its argument that aggregates should coincide with fractional periods on the quoted three year policy period provision language that "aggregate limits of liability as stated in this policy should apply separately to each annual period." Zurich contends that this language implicitly indicates that any period shorter than an annual period will have a reduced aggregate. Zurich states that if its interpretation is not adopted it will be liable for a total amount of coverage which exceeds $500,000 for less than a 12–month period or for a $1,500,000 pool of insurance for a 16–month period.

Neither side has cited any case in which this issue has been raised. Zurich relies on *Continental Insurance Co. v. Paccar,* 96

Wash.2d 160, 634 P.2d 291 (1981) in which the court held that an annual aggregate *deductible* of $500,000 should be pro rated when the insurance company cancelled a policy before the end of a term in order to avoid abuse by a carrier that might seek to cancel to avoid claim liability. In another case cited by UNR, *New Hampshire Insurance Co. v. National Recreation Equipment Co.*, 322 N.W.2d 890 (Iowa App.1982), a court rejected an effort to pro rate a deductible by the insured. Neither case is on point.

Zurich points to no language in its policy which limits the insurer's products liability to a corresponding fraction for periods shorter than one year. Comprehensive general liability policies do not limit the number of accident claims that can be made during a policy period for accidents which do not arise out of products losses. Aggregate limits are imposed only with respect to products coverage. When any additional limitation is imposed the language must be clear.

There is nothing in either the three year policy period provision or in the premium computation provision that states that a fractional period will carry with it a proportional limitation on available aggregate products coverage. If such was intended, as Zurich's argument implies, then a like limitation would apply to all items covered under a comprehensive policy and not just to products. Such a broad limitation is not urged and cannot be read into the contract. There is no apparent contract correlation between the premium charged and the aggregate products coverage as there is between product sales and the premium charged. Condition 5, "Limits of Liability Products," states that the amount "stated in the declarations as aggregate products," $500,000, "is the total limit[s] of the company's liability" for the "products hazard" under the policy. This language must control.

Since the language of the policy does not support the limitation claimed, UNR is entitled to the full policy aggregate of each insurance policy issued to it.

### C. First State's Annual Periods of Coverage

■ First State's single policy extended from November 26, 1974 to December 31, 1977—three years and five weeks. The First State Policy provides:

Policy Period: From November 26, 1974
To December 31, 1977

\*　　\*　　\*　　\*　　\*　　\*

If the Policy Period is more than one year and the premium is to be paid in installments, premium is payable on:

| Effective Date | December 31, 1975 1st Anniversary | December 31, 1976 2nd Anniversary |
|---|---|---|
| $2,732.50 | $2,500.00 | $2,500.00 |

The policy provides that First State, after the exhaustion of the underlying policies, is liable to pay up to "a limit of $2,500,000 in the aggregate for each annual period during the currency of the policy."

The three policy periods correspond to and are defined by the anniversary dates listed in the policy. The policy periods are November 2, 1974 to December 31, 1975, December 31, 1975 to December 31, 1976 and December 31, 1976 to December 31, 1977. The policy explicitly provides that December 31, 1975 is the first anniversary of the policy. The term "annual period" in the policy is not restricted to a period of 365 days. It can and here reasonably does mean an occurrence or recurrence in each year. *People ex rel. Will County Fair Ass'n v. Stanard*, 9 Ill.App.2d 550, 133 N.E.2d 757 (2d Dist.1956); *Sahlin v. American Casualty Co.*, 103 Ariz. 57, 436 P.2d 606 (1968).

To regard the policy as having four anniversary periods—contrary to its terms—because the first period contains five weeks,

would require the court to disregard the language of the policy. The plain meaning indicates that the parties contracted for three periods of $2.5 million coverage each.

## IV.

### *Rule 54(b) Considerations*

■ Rule 54(b) of the Federal Rules of Civil Procedure provides that:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

A certification under Rule 54(b) must satisfy three prerequisites for appellate review. *ODC Communications Corp. v. Wenruth Investments,* 826 F.2d 509 (7th Cir.1987). Each claim certified must be separate from the remaining claims, the judgment entered on the certified claims must be final under 28 U.S.C. § 1291, and the court must expressly determine that there is "no just reason for delay." *Id.* at 512; *see also Federal Deposit Insurance Corp. v. Elefant,* 790 F.2d 661, 664–65 (7th Cir.1986).

Only parties whose legal and factual positions are distinct may appeal a partial final judgment under Rule 54(b). *Sandwiches, Inc. v. Wendy's International, Inc.,* 822 F.2d 707 (7th Cir.1987); *see also Jack Walters & Sons Corp. v. Morton Bldg., Inc.,* 737 F.2d 698, 701–02 (7th Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 725 F.2d 1140 (7th Cir.1984). The issues must be sufficiently separate that the reviewing court may deal with the appeal confident that the same problem will not recur on a later appeal in the same case. *Sandwiches, supra* at 709.

The insurance coverage claims disposed of by declaratory judgment are legally distinct from the coverage, contract and tort claims which remain to be considered. No ruling or finding on a pending claim would have the effect of altering the prior findings or rulings with respect to those matters. The issues tried were selected with the hope that their disposition would enable the parties to resolve the entire controversy or, if not, establish a basis to determine the pool of primary insurance coverage available.

The judgment to be certified is a final judgment under 28 U.S.C. § 1291. A decision with respect to an individual claim is final when all rights and liabilities have been resolved. *United States General, Inc. v. Albert,* 792 F.2d 678, 680–81 (7th Cir.1986).

There is no just reason for delay. Final resolution of the matters determined will aid both this and the bankruptcy court's administration of the debtor's estate. Accordingly, good cause exists for the inclusion of a certificate pursuant to Rule 54(b) of the Federal Rules of Civil Procedure in the declaratory judgment to be entered in this case.

IT IS THEREFORE ORDERED that:

(1) UNR's motions for judgment notwithstanding the verdict and for a new trial are denied.

(2) Bituminous's motion for a directed verdict on the issue of policy exhaustion is granted.

(3) National Surety, Zurich, Bituminous and Continental are each entitled to declaratory relief and a declaratory judgment will be entered by the Clerk of the Court.

(4) UNR, Zurich and First State are each entitled to declaratory relief on certain questions of contract construction which will be included in a declaratory judgment.

(5) Pursuant to Rule 54(b) the court determines that there is no just reason to delay the entry of final declaratory relief which shall become immediately appealable.

(6) UNR's motion to remand certain withdrawn issues to the bankruptcy court is denied.

(7) This matter is set for a status hearing on March 15, 1988, at 9:15 a.m., to

discuss issues to be resolved in the next phase of this case.

### DECLARATORY JUDGMENT

This matter is before the court after a trial of Phase I issues which are more particularly described in a written opinion and order entered this date. The pleadings in this case filed by the parties hereafter identified, seek declaratory relief with respect to certain insurance coverage issues. As a result of the verdicts returned by the jury, and after considering and ruling upon motions for directed verdicts, judgment notwithstanding the verdict, and for a new trial, and after considering the briefs of the parties with respect to certain contract interpretation questions, declaratory relief will be granted as follows:

### I.

Based on the Special Verdict returned by the jury, the court declares as follows:

(1) National Surety Corporation (hereinafter referred to as National Surety) did not issue to UNR Industries, Inc. or any of its predecessors (hereinafter referred to as UNR), a comprehensive general liability policy of insurance No. CG 17304 for the period April 28, 1945 to January 1, 1948 which provided bodily injury insurance coverage of $100,000 per person and $300,000 per accident including products liability coverage for exposure to UNR's asbestos products without any aggregate products liability limits for bodily injury.

(2) National Surety did not issue to UNR a comprehensive general liability policy of insurance No. CG 53991 for the period January 1, 1948 to January 1, 1949 which provided for bodily injury insurance coverage of $100,000 per person and $300,000 per accident including products liability coverage for exposure to UNR's asbestos products without any aggregate products liability limits for bodily injury.

(3) UNR did not prove that it had a valid excuse for not giving prior notice of accident(s) and claim(s) to National Surety before 1983.

(4) Zurich Insurance Company (hereinafter referred to as Zurich) did not issue products liability insurance coverage applicable to UNR's asbestos claims prior to June 26, 1958.

(5) Zurich, Bituminous Casualty Corporation (hereinafter referred to as Bituminous), Continental Insurance Company (hereinafter referred to as Continental) and UNR entered into agreements, sometimes referred to as the Houston agreement or agreements, the terms of which are as follows:

UNR and its primary insurers (Continental, Zurich and Bituminous) agreed that where the claimant alleges in his complaint that he was exposed to Unarco asbestos products during any portion of the period during which Zurich provided coverage, Zurich would pay 25% of the costs and losses; where the claimant alleged that he was exposed to Unarco asbestos products during any portion of the period during which Bituminous provided coverage, Bituminous would pay 25% of the costs and losses. As to claims first asserted on or after January 1, 1980, Continental agreed to pay 4% of the costs and losses for such policy period during which exposure to Unarco asbestos products is claimed, subject to applicable deductibles for those years where Continental policies contain deductibles—1976, 1977, 1978 and 1979. The balance of the costs and losses would be the responsibility of Unarco. Where no specific period of exposure to Unarco products is alleged, Zurich would pay 25%, Bituminous would pay 25%, Continental would pay 24% and Unarco would pay 26%.

For claims first asserted on or before December 31, 1975 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |
| Continental | 15% |
| Unarco | 35% |

For cases first asserted in 1976 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |
| Continental | 50% subject to a $15,000 per claim deductible |

For 1977 through 1979 the allocations were:

| | |
|---|---|
| Zurich | 25% |
| Bituminous | 25% |

| Continental | 50% subject to a $30,000 per claim deductible |
|---|---|

During 1980 and 1981, the allocations were:

| Zurich | 25% |
|---|---|
| Bituminous | 25% |

The agreements were terminated by notice of UNR in October, 1981 effective December 31, 1981.

(6) The Houston agreement or agreements apply to cases which were filed but not settled and closed as of December 31, 1981.

(7) The Houston agreement or agreements were not entered into as a result of intentional misrepresentation either by or on behalf of Corroon & Black, Zurich, Bituminous or Continental, that Corroon & Black had shopped the insurance market prior to March 26, 1976 and that no new primary insurance coverage was available to UNR except that provided to UNR by Continental.

(8) UNR voluntarily and intentionally gave up the right to claim different treatment from Zurich, Bituminous or Continental for asbestos claims under its insurance policies.

(9) UNR is barred from pursuing its claims of misrepresentation or mutual mistake against Zurich, Bituminous or Continental because Zurich, Bituminous and Continental each relied in good faith to its detriment on UNR's conduct in entering into the Houston agreement or agreements.

## II.

Based on the court's ruling granting Bituminous's motion for a directed verdict, the court further declares that:

(1) Bituminous paid $3,015,002.17 in products claims on behalf of UNR as of July 9, 1982 and thereby has paid its full policy indemnity limits under the coverage provided by two comprehensive general liability policies (CG 873586 and GA 610667) for the period from November 1, 1964 to November 1, 1970.

(2) Bituminous has no obligation to pay any UNR costs of defense incurred after August 3, 1982, the date that it gave notice to UNR that its policy limits were exhausted. This ruling does not affect any claim UNR may have for unpaid defense costs as of August 3, 1982 and for any reasonable period thereafter if it can be shown that UNR reasonably required additional time to assume any additional defense obligations because Bituminous's policy limits were exhausted.

## III.

Based on Illinois law as announced by the Illinois Supreme Court in the case of *Zurich Insurance Company, et al. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987), which is directly applicable to the insurance contracts issued in this case, it is declared that:

(1) As to any claims filed against UNR after December 31, 1981, Zurich, Bituminous and Continental are each obligated to provide coverage of asbestos-related claims, including full defense until policy exhaustion, if the claimant in the action alleges bodily injury, sickness or disease during any of its policy periods. Bodily injury takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout the claimant's exposure to asbestos. An insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage. Disease takes place when it is reasonably capable of clinical detection and diagnosis. The determination of when a claimant's disease was reasonably capable of diagnosis must be made on a case-by-case basis. Sickness takes place at any time during which the claimant suffers from a disordered, weakened or unsound condition before the clinical manifestation of a disease. Whether and when a claimant suffered a sickness must be determined on a case-by-case basis.

(2) Zurich, Bituminous and Continental do not have any obligation to assume the costs of defending actions against UNR after their duty to indemnify has been discharged by the payments of judgments or settlements and they have made an orderly withdrawal from UNR's defense.

## IV.

With respect to certain contract interpretation questions the court declares as follows:

(1) The amount of products coverage provided by Zurich's policies for the periods June 26, 1958 to January 1, 1959; January 1, 1961 to April 1, 1961; and April 4, 1964 to November 1, 1964 is a question of law for the court. As a matter of contract interpretation the court concludes that there is no language in any policy which limits UNR from claiming products coverage in the amount of $500,000 for each of these periods as stated in each of the policies.

(2) The issue of the amount of products coverage provided by the single First State Insurance Company excess policy issued to UNR is a question of law. As a matter of contract interpretation the court concludes that the policy contains three periods during each of which UNR is entitled to $2,500,000 excess insurance coverage or a total of $7,500,000 for the policy period.

## V.

In accordance with Rule 54(b) of the Federal Rules of Civil Procedure, this court hereby determines that there is no just reason for delay and directs that this declaratory judgment be entered by the Clerk of the Court as a final determination of the matters set forth herein.